IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 7:13-cr-00013 |
| | ) | |
| WILLIAM A. WHITE, | ) | By: Elizabeth K. Dillon |
| Defendant | ) | United States District Judge |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the court on defendant William A. White's *pro se* motion for

compassionate release (Dkt. No. 395) filed pursuant to 18 U.S.C. § 3582(c)(1)(A) and the

supplemental motions he has filed.  (Dkt. Nos. 399, 410.)  Also pending is White's third motion

to supplement.  (Dkt. No. 414.)  The court will grant the third motion to supplement and has

considered the supplement and attached supplemental report of Dr. Samuels (Dkt. No. 414-1),

dated May 20, 2021, in this opinion.  The government responded to White's motion for

compassionate release (Dkt. No. 415), and White has filed a reply to the response (Dkt. No. 420).

Because the court finds that White has failed to present an extraordinary or compelling reason

that he is entitled to compassionate release, and because the 18 U.S.C. § 3553(a) factors weigh

against release, White's motion for compassionate release, as supplemented, will be denied.

I.  BACKGROUND

Following a three-day jury trial, White was convicted on November 1, 2013, of four

counts of knowingly and with the intent to extort money and other things of value from a person

identified as MW, transmitting threatening communications by email in interstate and foreign

commerce.  (Indictment, Dkt. No. 1; Jury Verdict, Dkt. No. 163.)  The charges were based on

threats White made to his ex-wife for money he believed she owed him.  (Presentence

Investigation Report (PSR), Dkt. No. 201, at ¶¶ 3–10.)  On May 6, 2014, White was sentenced to a term of 92 months, on each of Counts 1, 3, and 4, and 60 months on Count 2, all to be served concurrently with one another but consecutive to any other sentence.  He also was sentenced to a three-year term of supervised release.  (J., Dkt. No. 199.)  White appealed, and the conviction was affirmed.  *United States v. White*, 810 F.3d 212 (4th Cir. 2016).

White has a long history of engaging in threatening behavior for which he has been tried, convicted, and sentenced.  In 2008 in Indiana, White, who identifies as a white nationalist and describes himself as being "opposed to Judaism," and not believing that "Negroes are human" (Decl. of William White, Dkt. No. 395–4, ¶¶ 38, 186, 189), was indicted for soliciting the commission of a violent offense against a juror who had served on a jury that convicted one of his fellow white supremacists.  *United States v. White*, 698 F.3d 1005, 1009-10 (7th Cir. 2012) (per curiam).  White was tried by a jury which convicted him.  After the trial court granted White's motion for entry of a judgment of acquittal, the government appealed.  The Seventh Circuit Court of Appeals reversed White's acquittal, reinstated his conviction, and remanded his case for sentencing.  *Id*. at 1008, 1020.  On remand, White was sentenced to 42 months.  *United States v. White*, No. 1:08-CR-851 (N.D. Ill., Feb. 20, 2013).

In 2009 in the Western District of Virginia, White was convicted of three counts of transmitting in interstate commerce threats to injure or intimidate individuals, in violation of 18 U.S.C. § 875(c), and one count of intimidating individuals to influence, delay, or prevent their testimony, in violation of 18 U.S.C. § 1512(b)(1).  *United States v. White*, 670 F.3d 498, 502-03 (4th Cir. 2012).  The charges stemmed from threats White made to an employee at a bank where he had a dispute over past-due amounts of money he owed; threats he made to a group of Black tenants who were bringing a race discrimination claim against the United States Department of

Housing and Urban Development; threats to kill university administrators who helped initiate a diversity training program; and threats to kill a Canadian civil rights lawyer.  Most of the threats were race or religion based.  *Id*. at 502–06.  After a jury found White guilty on the four counts, the district court entered a judgment of acquittal on one of the counts.  *United States v. White*, No. 7:08-cr-54 (W.D. Va. Apr. 19, 2010) (Dkt. No. 155).  On April 14, 2010, White was sentenced to a term of 30 months to be followed by a term of supervised release of 36 months. *United States v. White*, No. 7:08-cr-54 (W.D. Va. Apr. 19, 2010).  The Fourth Circuit affirmed the conviction but remanded White's case to the district court so that it could reconsider the government's evidence on the vulnerable victim adjustment.  *White*, 670 F.3d at 515-16.

In the meantime, White had been released from custody on April 20, 2011, to begin serving his term of supervised release.  (Dkt. No. 271 in *White*, No. 7:08-cr-54.)  After the Fourth Circuit remanded the case, the district court set a hearing to resentence White on May 14, 2012.  On May 11, 2012, it was discovered that White had absconded.  (Dkt. Nos. 266, 271 in *White*, No. 7:08-cr-54.)  An arrest warrant was issued, and White was arrested in Miami, Florida, on June 9, 2012.  (Dkt. No. 277 in *White*, No. 7:08-cr-54.)  On October 23, 2012, White was sentenced to 33 months on the three counts with credit for time served.  White also was sentenced to a 36-month term of supervised release.  (*Id*. at Dkt. No. 316.)  In addition, White was sentenced to a 10-month term of incarceration for violation of the terms of supervision, with the sentence to run consecutively to any other federal or state sentence.  (*Id*. at Dkt. No. 310.)

In the meantime, White continued to threaten and intimidate people for personal and political reasons.  In 2012, while he was a fugitive in Mexico, White made threats to three Florida state officials to kidnap, rape, and murder them and their spouses, children, and grandchildren. *United States v. White*, 654 F. App'x 956, 958 (11th Cir. June 30, 2016) (per

3

curiam).  He threatened to kill the officials if members of a group called the American Front were not released from prison.  *Id*. at 960-61.  White also threatened the district judge and the United States prosecutor involved in his Western District of Virginia case.  *Id*. at 959.  White was charged with five counts of extortion by interstate commerce in violation of 18 U.S.C. § 875(b).  A jury found him guilty, and the court sentenced him to 210 months on each count to run concurrently with each other, but consecutive to the 92-month sentence imposed in the instant case.  *Id*. at 962.  White appealed, and the conviction was affirmed.  *Id*. at 972.

All of White's convictions add up to sentences totaling approximately 30 years.  White currently is housed at FCI Terra Haute and has a projected release date of May 29, 2037.[1]

## II.  DISCUSSION

White seeks compassionate release under 18 U.S.C. § 3582(c)(1).  Specifically, he asks to have the 92-month sentence in his case before this court reduced to a 92-month term of supervised release.  He claims that because he was tortured in prison he is suffering from physical and mental impairments that have substantially diminished his ability to provide self-care and from which he is not expected to recover.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act ("FSA"), authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of

[1] https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last viewed May 12, 2022) (search William A. White).

4

> imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, White's requested relief requires the court to consider (1) if he exhausted his administrative remedies; (2) if so, whether there are extraordinary and compelling reasons that warrant a reduction in his sentence; and (3) if so, what, if any, sentence reduction is appropriate, after considering the applicable 18 U.S.C. § 3553(a) factors, and whether White is a danger to the safety of the community.

## A. Exhaustion

White has fully exhausted his administrative remedies. The provision allowing defendants, in addition to the Bureau of Prisons ("BOP"), to bring motions under § 3582(c) was added by the First Step Act to "increas[e] the use and transparency of compassionate release." Pub. L. No. 115-391, 132 Stat. 5239 (2018). Before bringing a motion in the district court, a petitioner must first exhaust his administrative remedies. *See* 18 U.S.C. § 3582(c)(1)(A). A petitioner must satisfy one of two conditions, whichever is earlier: (i) "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf" or (ii) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility[.]" *Id*.; *see United States v. McCoy*, 981 F.3d 271, 283 (4th Cir. 2020).

Here, White requested compassionate release from the BOP on August 29, 2019. (Letter, Dkt. No. 395-2 at 35.) The warden denied White's request on October 28, 2019. (Resp., Dkt. No. 395-2 at 87.) White filed his compassionate release motion with the court on November 9, 2020. (Dkt. No. 395.) White thus satisfied the administrative exhaustion requirement under the

second path provided by § 3582(c)(1)(A).  *See United States v. Muhammad*, 16 F.4th 126, 129

(4th Cir. 2021) ("The text of § 3582(c)(1)(A) plainly provides that a defendant may file a motion

on his own behalf 30 days after the warden receives his request, regardless of whether the

defendant exhausted his administrative remedies.")  In addition, the requirement that a petitioner

complete certain steps before filing his motion is a claim-processing rule rather than

jurisdictional.  *Id*.  As such, it can be waived or forfeited.  *Id*. at 130.  The government does not

contest that White has exhausted his administrative remedies.  Accordingly, the court finds that

White has satisfied the statute's exhaustion requirements.

**B.  Extraordinary and Compelling Reasons**

The court must next consider whether there are any "extraordinary and compelling

reasons" that would warrant "reduc[ing] the term of imprisonment" imposed in White's case.  18

U.S.C. § 3582(c)(1)(A).  In *McCoy*, 981 F.3d at 284, the Fourth Circuit held that district courts

may consider "<u>any</u> extraordinary and compelling reason for [compassionate] release that a

defendant might raise."  *McCoy*, 981 F.3d at 284 (citing *United States v. Brooker*, 976 F.3d 228,

239 (2d Cir. 2020)).  In so finding, the court rejected the notion that district courts are

constrained by the policy statement found in U.S.S.G. § 1B1.13 and the application note that

accompanies the policy statement.  *See discussion, McCoy*, 981 F.3d at 280-84.

Although the court is not limited to the policy statement and the application note, the

policy statement "remains helpful guidance."  *McCoy*, 981 F.3d at 282, n.7.  Application Note

1(A)(ii) to U.S.S.G. § 1B1.13 provides that extraordinary and compelling reasons for

compassionate release exist when a defendant is suffering from a serious physical or medical

condition, or a serious functional or cognitive impairment that substantially diminishes the

ability of the defendant to provide self-care within the environment of a correctional facility and

6

from which he is not expected to recover.  While "self-care" is not defined in the application note, courts that have examined the issue have required petitioners to show a high level of disability.[2]

For example, in *United States v. Handy*, No. PJM 04-0559, 2020 WL 2041666 (D. Md. April 28, 2020), a district court found that an inmate was unable to provide self-care when he could not walk and was confined to a wheelchair or bed twenty-four hours a day, needed help breaking his food into small pieces, fetching a meal tray, opening packaging, and clipping his toenails due to his right hand being "completely deformed." *Id*. at *4 (internal citations omitted). Conversely, in *United States v. Mattingley*, No. 6:15-cr-00005, 2020 WL 974874 (W.D. Va. Feb. 28, 2020), the court found that a double amputee who required the use of prosthetics to ambulate and who also suffered from phantom pain, a propensity for infection, diabetes, kidney disease, and high blood pressure had not shown that he could no longer provide self-care. *Id*. at *1, 5.  In *United States v. Coleman*, No. 3:17-cr-8, 2020 WL 5016967 at *3 (W.D. Va. Aug. 18, 2020), the court found that an inmate with vision loss due to uveitis who could not climb stairs and was limited to a lower bunk did not show his condition was so severe that he could not provide himself with self-care.  Similarly, in *United States v. Casey*, No. 1:06-CR-00071, 2019 WL 1987311, at *1 (W.D. Va. May 6, 2019), the court determined that the defendant's limited mobility and inability to climb stairs did not suffice show to he was unable to engage in self-care. *See also United States v. Clark*, No. 3:13-CR-163-FDW-1, 2019 WL 1052020, at *1 (W.D.N.C.

---

[2] BOP Program Statement 5050.50 considers compassionate release for inmates who have suffered a debilitating injury from which they will not recover.  The BOP considers release if the inmate is completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to bed or chair; or is capable of only limited self-care and is confined to a bed or chair more than fifty percent of waking hours.  BOP review also considers any cognitive deficits of the inmate although a cognitive deficit is not required in cases of severe physical impairment but may be a factor when considering the inmate's ability or inability to reoffend.  While the program statement is not binding on the courts, it indicates the severity of a disability that the BOP finds necessary before considering an inmate eligible for compassionate release.

Mar. 5, 2019) ("declining health, diabetes, stage-3 kidney failure, and back issues that require a walker" did not compromise ability to provide self-care).

White, in support of his argument that he is entitled to compassionate release because he has a substantially diminished ability to provide self-care, cites the reports of clinical psychologists Richard M. Samuels, Ph.D., and Eric Ostrov, Ph.D.  However, neither report provides support for White's allegation that he is unable to provide self-care while incarcerated.

In 2019, Dr. Samuels diagnosed White with chronic Post-Traumatic Stress Disorder (PTSD) and Narcissistic Personality Disorder with histrionic, antisocial, and obsessive-compulsive traits.  (Samuels Report, Dkt. No. 395-2 at 10-11.[3])  But nothing in the report indicates that White is disabled either mentally or physically to the point that he cannot provide self-care.  For example, Dr. Samuels described White as being appropriately dressed with "hygiene acceptable by jail standards."  (*Id*. at 4.)  White was pleasant and appeared to be forthcoming regarding the details of his case.  (*Id*.)  His affect was labile, and his mood was somewhat depressed, but there were no apparent signs of psychosis or visible manifestations of organicity.  His thought processes, attention, and concentration appeared to be normal, and his intelligence was estimated to be at least above the average range.  His gait and general appearance were normal, and he reported that his sleep was normal.  (*Id*.)  White told Dr. Samuels that he had been subjected to sleep deprivation for several months in 2014 and that because of unsanitary conditions in a jail in 2008, he became sick, stopped eating and drinking, had altered perceptions and hallucinations, and wrote on the walls with his blood.  (*Id*. at 4–5.)

---

[3]  It appears that Dr. Samuels' evaluation and report were completed in 2019 at the request of an attorney who is representing White in a civil lawsuit challenging prison conditions.  White alleges that he was subjected to "enhanced interrogation conditions" including unsanitary conditions in his cell and sleep deprivation.  *See* Samuels Report, Dkt. No. 395-2 at 2, 4.

Psychological testing showed that White met the diagnostic criteria for PTSD. Testing further showed that White's memory was intact. (*Id*. at 7–8.) White's test results "raised a mild concern about overstating problems for a general population respondent and a slight concern for someone in an outpatient setting," but were consistent for someone in an inpatient setting. (*Id*. at 8.) His profile showed a slightly high but plausible number of unusual physical ailments, suggesting he "genuinely experience[d] these symptoms rather than reporting arbitrary or contrived problems." (*Id*.) Testing also showed White had difficulties in "cognitive processing, such as confusion, irrational beliefs, inattention, forgetfulness, misunderstandings, and misperceptions." (*Id*.) He had a moderately high score in aggressiveness, which tended to be associated with hostile feelings or impulses and the possible directive use of intimidation, force, and aggression to reach ends. (*Id*.) "Numerous cognitive complaints point[ed] to problems with attention, concentration, and memory," perhaps warranting further evaluation. (*Id*. at 9.) White did not appear to suffer from low moods, abnormally high moods, or excessive anger and had a sufficient sense of confidence, self-sufficiency, and resolve to handle most situations. (*Id.*) Ideas of persecution formed a core feature of White's profile, but he appeared to maintain self-control and mostly responsible or acceptable behavior rather than engaging in patterns of antisocial actions. (*Id*.)

Additional testing showed anxiety to be a moderate concern involving some degree of worry, restlessness, tension, or indecisiveness with possibly occasional periods of more pronounced uneasiness. He had a self-image of being fabulously talented, astute, capable with wonderful skills and aptitudes that characterized him as meriting unique respect and esteem. He was described as feeling entitled to receive extra attention, affection, and special treatment and was likely to be deficient in compassion, kindness, and sensitivity to others. It was noted that the

anxiety features, though not extreme, might sometimes create lapses in his attention and

concentration.  Measures of dysthemia, major depression, and manic features indicated no

problems in those areas, suggesting a normal range of emotional experiences rather than

depressed or overly elevated mood states.  (*Id*. at 10.)

Dr. Ostrov interviewed and tested White a number of times in 2015 and 2016 and

prepared a report dated July 22, 2016.[4]  Dr. Ostrov described White as appropriately groomed,

sociable, and willing to participate in the evaluation.  (Ostrov Report, Dkt. No. 395-2 at 47.)  He

was fully oriented to person, place, and time and expressed pride related to a genealogical project

and a book he was writing.  (*Id.*)  White was sometimes hard to follow because he spoke in a

pressured, scattered way.  His tone was one of protest and occasionally there was an indication of

paranoid thinking or suspiciousness.  (*Id*. at 47-48.)  White did not indicate any notable physical

problems or a history of notable physical illnesses.  (*Id*. at 50.)  He reported moderate symptoms

of stress, anxiety, and disillusionment, including worrying too much, nervousness or shakiness

inside, trouble falling asleep, feeling easily annoyed or irritated, feeling trapped or caught, and

feeling most people could not be trusted.  (*Id*. at 66.)  Dr. Ostrov diagnosed White with PTSD

and Personality Disorder with Borderline and Narcissistic Traits.  (*Id*. at 68.)

Dr. Ostrov opined that White had Borderline traits showing a pattern of unstable, chaotic,

and intense interpersonal relationships, impulsivity, and difficulty controlling anger.  Test results

showed he was suffering from marked stress, with sudden feelings of anxiety, sleep difficulty,

irritability, anhedonia, and feeling hopeless about the future.  (*Id.* at 69.)  Finally, Dr. Ostrov

commented that White would be a difficult person to treat because he was not insight oriented or

psychologically minded.  He tended to see things as a function of the malicious or conspiratorial

---

[4] Dr. Ostrov's report also appears to have been prepared as part of a civil lawsuit.  *See* Ostrov Report, Dkt. No. 395-2 at 46.

behavior of others.  Dr. Ostrov recommended that White receive a long course of treatment that focused on coping with and alleviating symptoms of PTSD and that he might benefit from medication.  (*Id.* at 69-70.)

Notably, while both psychologists diagnosed White with mental health conditions including PTSD, neither offered an opinion as to whether White was limited in his ability to provide self-care in a prison environment.  Nor has White described any limitations in his ability to care for himself while incarcerated.  He states that he experienced stress-induced psychosis in February 2011 and earlier, and that he was in a catatonic state from February 17, 2011, to March 9, 2011.  He also claims that his psychological symptoms caused him to be unable to eat or drink in June 2014 to such an extent that he almost died from dehydration.  (Mot., Dkt. No. 395 at 19-20.)  He claims that he continues to be at risk of relapse of the most severe symptoms for the rest of his life.

White's description of his impairments does not lead to the conclusion that he is unable to engage in self-care.  His most recent serious mental health episode was almost eight years ago, and he has since been described as appropriately dressed and groomed and as being pleasant and sociable.  He was able to relay his involvement with the justice system to Drs. Samuels and Ostrov in great detail and told them that he was working on a genealogical project and writing a book.  Nothing about these activities indicates that White cannot engage in self-care.

White likens his case to that of the petitioner in *United States v. Pina*, No. 18-cr-179, 2020 WL 3545514 (S.D.N.Y. June 29, 2020).  The court there found that based on reports from mental health providers, Pina most likely suffered from PTSD.  (*Id.* at *2.)  Pina reported that prior to COVID-19, he tried to reduce his mental health symptoms by remaining busy and exercising.  According to a psychologist retained by Pina, when COVID-19 required him to be

confined to his cell for twenty-two hours each day, Pina experienced a worsening of his chronic symptoms, causing him to experience "acute symptoms of depression, anxiety, and irrational fears of being harmed or killed in custody, as well as irrational fears of harm coming to his infant daughter, girlfriend and mother." (*Id*. at *2.)  The psychologist concluded that under the lock-down circumstances, "fear for Pina's well-being is justified, and the possibility of suicide [could not] be dismissed." *Id.*

The court considered the more equivocal analyses offered by two other psychologists but concluded that Pina was "experiencing increasingly severe mental distress as a result of the lockdown procedures imposed at FCI Allenwood and that this might well lead him to seek to harm himself."  The court concluded that the danger constituted an "extraordinary and compelling reason" warranting a reduction in the term of imprisonment because the combination of circumstances "substantially diminish[ed] the ability of the defendant to provide self-care within the environment of" the prison.  (*Id*. at 2.)

Unlike the petitioner in *Pina*, White has offered no evidence that his PTSD symptoms have worsened during the COVID-19 pandemic or that his well-being is at risk.  He relies on reports produced prior to the pandemic that do not indicate he was at risk for self-harm and has presented no evidence indicating his circumstances have changed.

White also argues that is case is like that of the petitioner in *United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019).  Beck was an inmate who suspected she had breast cancer and sought diagnosis and treatment from the Bureau of Prisons (BOP).  The BOP delayed Beck's examination, biopsy, surgery, and other treatment for months, allowing her cancer to spread. Beck sought compassionate release among other relief, and the court granted her motion.  The court found that Beck had received grossly inadequate treatment for her invasive breast cancer

and that, absent judicial oversight, she was unlikely to receive better treatment at the institution going forward.  The court found that Beck's urgent need of appropriate treatment to prevent further spread of her disease and the potential loss of her life were "extraordinary and compelling" reasons to reduce her sentence under § 3582(c)(1)(A).

White argues that, like Beck, he has a "seriously disabling medical condition" that the BOP is refusing to treat.  (Mot., Dkt. No. 395 at 21.)  He argues that his case "goes beyond" Beck's case because the BOP caused his injuries when they tortured him.  Leaving aside for a moment White's allegations of torture, he cannot show that the BOP has refused to treat him.  At a January 2015 mental health intake screening at FCI Loretto, it was noted that White had no history of mental health issues or treatment and no current symptoms.  He had no need for clinical intervention more than quarterly and expressed no interest in individual or group treatment.  (Screening Record, Dkt. No. 420-5 at 3.)

White was seen by a psychologist at FCI Marion on January 23, 2017, to discuss his tort claim, his self-reported PTSD symptoms, and to evaluate him for mental health symptoms.  (Clinical Contact, Dkt. No. 420-5 at 5.)  It was noted that White had not requested mental health services since arriving at FCI Marion in June 2016.  *Id.*  His mental status examination was within normal limits.  *Id.*  He was reminded of the available mental health services and of the various ways he could obtain psychological services.  He was taking no psychotropic medications and expressed no desire for a new psychiatry medication consult.  *Id.*

In July 2017, White told a member of the psychiatric department that he wanted his records to reflect a diagnosis of PTSD.  White was told that he could complete a release form, and he did so to have Dr. Ostrov's records sent to the BOP.  (Records, Dkt. No. 420-5 at 8-10.)  On June 20, 2021, a BOP psychologist, Annabel Fields, JD, PsyD, noted the receipt and contents

13

of Dr. Ostrov's report and further noted that in July 2019 White was offered the opportunity to speak to a psychologist but expressed no interest or need at that time.  She stated that she had been doing weekly rounds where White was housed and he had not mentioned PTSD, a desire to be evaluated, or a desire for treatment during that time.  (*Id.* at 11.)

In an email exchange with Dr. Fields on June 24, 2021, White told her that he had severe, chronic PTSD but that exercises in a book she had given him had helped his "primary remaining symptom, which was insomnia, but it [had] not gone away."  Dr. Fields replied that she would bring him a book on insomnia the following week, and added, "Do remember that symptoms can reemerge, and please let me know if that's the case so we can discuss it if you'd like to do so." White clarified that insomnia was not the only remaining symptom that he experienced, but it was the most pronounced.  He added, "The memory problems and issues with speech have declined substantially.  Plus, I continue to have severe, chronic, PTSD symptoms."  (*Id.* at 12.)

White claims that Dr. Fields lied when she said she had not treated him because he had discussed his PTSD with her and she had given him a workbook, which he had completed. (Decl. of William White, Dkt. Nos. 420-2, ¶¶ 6-11; 420-5 at 13.)  The court finds that White's description of his interaction with Dr. Fields is not inconsistent with Dr. Fields' notes that White completed a notebook but did not otherwise seek psychiatric care.  More importantly, nothing in their email exchange, or in any documents White submitted, indicates that he asked for but did not receive care.

In his most recent motion to supplement, White submitted a letter from Dr. Samuels, dated May 20, 2021, in which Dr. Samuels relates that White told him that he did not receive proper treatment for his PTSD.  (Letter, Dkt. No. 414-1.)  Dr. Samuels notes that White has not been diagnosed with PTSD "within the facility" and has not received any treatment for the

disorder.  (*Id.* at 2.)  While that appears to be true, it does not undermine the conclusion that White has not asked for treatment for any mental health disorder.  White has submitted several hundred pages of documents, including his own sworn statements, and nowhere in the records does he indicate that he sought and was refused mental health treatment.

Thus, unlike the plaintiff in *Beck*, White has made no showing that he has been denied treatment for PTSD while incarcerated.  To the contrary, records show that he has not requested treatment but found exercises in a workbook he was provided to have been helpful.

Regarding White's allegations of torture, White has at least one lawsuit pending related to his allegations that he was tortured while he was incarcerated in Seminole County, Florida. *See White v. Eslinger*, No. 6:14-cv-00936-WWB-EJK (M.D. Fla. filed June 17, 2014).  *See also White v. Berger*, 709 F. App'x 532 (11th Cir. Sep. 15, 2017), and *White v. Berger*, 769 F. App'x 784 (11th Cir. Apr. 19, 2019).  White also filed a lawsuit in the Southern District of Illinois in 2017, *White v. United States*, No. 3:17-cv-00683-JPG (S.D. Ill., dism. Sept. 27, 2021), alleging he was entitled to damages under the Federal Tort Claims Act for torture while incarcerated and resulting PTSD.  *See* Dkt. 1 in No. 3:17-cv-00683-JPG.  The district court dismissed that case on September 27, 2021, and White has appealed the dismissal.

Regardless of whether White prevails on a claim that he was tortured while he was in prison or is entitled to damages under the Federal Tort Claims Act, those claims arose while he was incarcerated in Florida, and he is pursuing those civil claims in other courts.  He has made no allegation that he currently is being tortured, and, if he were, the proper means to address it would be to file a civil rights lawsuit seeking injunctive relief in the district where he is incarcerated.  White has pointed to no authority to support his argument that being tortured at a

different facility several years ago is an extraordinary and compelling circumstance justifying a sentence reduction under § 3582(c)(1)(A).

For all the above-stated reasons, the court finds that White has not shown any extraordinary and compelling reasons that would warrant reducing his term of imprisonment. Therefore, he is not entitled to compassionate release.  In addition, as discussed below, even if White demonstrated extraordinary and compassionate circumstances, the § 3553(a) factors weigh against a sentence reduction.

## C.  Section 3553(a) Factors

Had the court found that an extraordinary and compelling reason exists for a sentence reduction, it would still need to "'consider[]' the § 3553(a) sentencing factors 'to the extent that they are applicable' in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment."  *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)).  Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

16

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; . . . .

18 U.S.C. § 3553(a).  Here, the government argues that the § 3553(a) factors counsel against granting a sentencing reduction.  (Resp. in Opp'n, Dkt. No. 415, at 12-14.)  The court agrees.

Turning first to the nature and circumstances of the instant offense, the PSR describes how White told his estranged wife, via email, that he would have someone "beat [her] ass" if she did not pay him money that he believed she owed him.  (PSR, Dkt. No. 201, ¶ 5.)  He also told her via email that if she attempted to keep his daughter from him, she would "have the living s*** beat out of [her] to start with."  (*Id.*, ¶ 6.)  He also told her that if she did not have $500 when contacted by his associate that she would "probably be hospitalized."  (*Id.*, ¶ 7.)  Finally, he told her that if she paid him, she would "avoid an incident in which something violent potentially happens to you around the baby."  (*Id.*, ¶ 8.)  White testified at trial that someone else sent the emails, but the jury found that White sent them.  (*Id.*, ¶ 12.)  These threats to his wife weigh against a sentence reduction.

Nor do White's history and characteristics support a determination that his sentence should be reduced.  As set forth above, White has a long history of threatening violence and soliciting violence toward both people he knows as well as strangers.  He was convicted of soliciting the commission of a violent federal offense against a juror who had served on a jury

that convicted one of his fellow white supremacists; threatening an employee at a bank; threatening Black tenants who were bringing a race discrimination claim against a federal housing agency; threatening to kill university administrators who helped initiate a diversity training program; threatening Florida officials and their families if certain individuals were not released from prison; and threatening a district judge and the United States prosecutor who were involved in his prosecution.  In addition, while he was on supervised release and awaiting resentencing in 2012, he absconded to Mexico.  His threatening behavior and inability to abide by conditions of supervised release warrant continued incarceration.

Turning to the next factors, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public, the court finds that White's continued incarceration will best serve these goals.  White has shown no remorse for any of his actions and typically denies that he engaged in the actions, despite factual findings to the contrary.  (*See*, generally, White Decl., Dkt. No. 395-4.)  Nothing in the materials he presented to the court indicates that he would refrain from making threats to individuals in the future.

Looking at the kinds of sentences available and the sentencing range established for White's convictions, under the United States Sentencing Guidelines, White faced a sentence of 92 months to 115 months, to be followed by a period of supervised release of 1 to 3 years.  (Sent. Tr., Dkt. No. 214 at 34.)  The court sentenced him to 92 months, finding that the sentence was sufficient in the case and satisfied the purposes of sentencing.  (*Id.* at 35.)  The court also overruled the United States' motion to classify White as a career criminal.  (*Id.* at 33.)  The court finds that White's sentence of 92 months continues to be a proper sentence in his case.  The sentence was at the low end of the guidelines but reflected the court's concern that White

continued to threaten people even though he had previously been punished for engaging in similar conduct.  Based on the foregoing, the court finds that the § 3553(a) factors weigh against reducing White's sentence.[5]

### III.  CONCLUSION

For the reasons stated herein, it is hereby **ORDERED** that White's third motion to supplement his motion for compassionate release (Dkt. No. 414) is **GRANTED** and White's motion for compassionate release (Dkt. No. 395), as supplemented (Dkt. Nos. 399, 410, 414), is **DENIED**.  The clerk is directed to send a copy of this memorandum opinion and order to the defendant, the United States, and the United States Probation Office.

Entered: May 12, 2012.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
United States District Judge

---

[5]  None of the other § 3553(a) factors weigh in favor or against a sentence reduction.